UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN BURNELL, et al.,<br><br>            Plaintiffs,<br><br>      v.<br><br>SWIFT TRANSPORTATION CO.<br>OF ARIZONA, LLC,<br><br>            Defendant. | Case No. EDCV10-00809-VAP (OPx)<br><br>**Order (1) GRANTING Parties'<br>Stipulated Request to Re-Approve<br>Motion for Final Approval of Class<br>Action Settlement Following<br>Remand; and (2) GRANTING IN<br>PART Motion for Final Approval of<br>Class Action Settlement**<br><br>**(Dkt. 227, 273)** |

Before the Court is the parties' stipulated request for the Court to re-approve Plaintiffs' Motion for Final Approval of Class Action Settlement (the "Motion") following the Ninth Circuit's remand of this action, as well as oppositions thereto filed by Objectors Sadashiv Mares and Lawrence Peck. (Dkt. 227, 273-276).  After considering all papers filed in support of, and in opposition to, the stipulated request, the Court GRANTS IN PART the parties' request set forth in the parties' stipulation and the Motion.

## I.    BACKGROUND

On June 7, 2019, Gilbert Saucillo and James Rudsell ("Plaintiffs") filed their consolidated complaint[1] on behalf of a putative class of non-exempt

_____

[1] On June 7, 2019, after a stipulation by the parties, the Court consolidated this action, *John Burnell v. Swift Transportation Co Inc., et al.*, No. 5:10-cv-00809-VAPOPx, with *James R. Rudsell v. Swift Transportation Company of*

truck drivers against Defendants Swift Transportation Co., Inc. and Swift Transportation Co. of Arizona, LLC ("Defendants").  (Dkt. 204 ).  Plaintiffs brought the following claims: (1) recovery of unpaid minimum wages, (2) failure to provide meal and rest periods, (3) failure to indemnify, (4) failure to furnish timely accurate itemized wage statements, (5) unlawful pay instruments, (6) failure to pay timely all earned final wages, (7) unfair competition, and (8) civil penalties. (*Id.*).

Discovery in this case included production of payroll documents, Department of Transportation and other driver logs, and corporate policy documents, as well as the depositions of several witnesses and the class representatives.  (Dkt. 197 at 14–15).  The parties attended a day-long mediation with mediator Mark Rudy on April 23, 2018, and although the case did not settle then, the parties continued discussions and ultimately arrived at an informal compromise that forms the basis for the settlement now presented to the Court (the "Settlement Agreement").  (*Id.* at 16).

On July 30, 2019, the parties moved to certify the class conditionally and approve preliminarily the Settlement Agreement. (Dkt. 197).  The Court granted preliminary settlement approval on August 16, 2019.  (Dkt. 212). The parties now move for final approval. (Dkt. 227).

The key terms of the Settlement Agreement are as follows. Defendants will pay Plaintiffs a non-reversionary Gross Settlement Amount of $7,250,000.  (Dkt. 227-1 at 12).  Of this, class counsel will receive

---

*Arizona LLC, et al.*, No. 5:12-cv-00692-VAP-OPx (hereafter, "Rudsell'). (Dkt. 190).

$2,416,666.67 (33.33%) in legal fees and $67,551.61 in litigation expenses; the named plaintiffs will each receive a $5,000 incentive award; the settlement administrator, ILYM Group, Inc., will receive $100,000; $375,000 will go to California's Labor and Workforce Development Agency ("LWDA") under the Private Attorneys General Act ("PAGA"); and the Net Settlement Amount of $4,273,333.33 will be distributed to the settlement class members, for an average award of $217.50 per class member. (*Id.*).

The Court granted final approval the Settlement Agreement on January 9, 2020 and entered judgment on February 10, 2020.  (Dkt. 236, 246).  Two objectors, Lawrence Peck and Sadashiv Mares, filed notices of appeal.  (Dkt. 240, 244, 248, 250).  On February 11, 2022, the Ninth Circuit filed an opinion dismissing Peck's appeal and vacating approval of the Settlement Agreement.  (Dkt. 270).  The Ninth Circuit held that the Court incorrectly applied a presumption of fairness to the Settlement Agreement and remanded for further proceedings.  (*Id.* at 23-29).

The Court ordered the parties to file briefing regarding how the Court should interpret and apply the Ninth Circuit's order.  (Dkt. 272).  The parties filed a "Joint Brief re Approval of Class Action and PAGA Settlement" on March 25, 2022.  (Dkt. 273).  Objectors Sadashiv Mares and Lawrence Peck filed opposition thereto on March 31, 2022 and April 5, 2022, respectively.[2] (Dkt. 272, 275-276).

---

[2] Objector Lawrence Peck also filed a notice of errata correcting his opposition brief on April 21, 2022.  (Dkt. 276).

## II.   LEGAL STANDARD

Under Rule 23(e) of the Federal Rules of Civil Procedure, "claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval."  Fed. R. Civ. P. 23(e).  A court must engage in a two-step process to approve a proposed class action settlement.  First, the court must determine whether the proposed settlement deserves preliminary approval.  *Nat'l Rural Telecomms. Coop. v. DirecTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004).  Second, after notice is given to class members, the Court must determine whether final approval is warranted.  *Id.*  A court should approve a settlement pursuant to Rule 23(e) only if the settlement "is fundamentally fair, adequate and reasonable."  *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993); *accord In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)).

In the Ninth Circuit, courts must balance the following factors to determine whether a class action settlement is fair, adequate, and reasonable: (1) the strength of the plaintiffs' case, (2) the risk, expense, complexity, and likely duration of further litigation, (3) the risk of maintaining class action status throughout the trial, (4) the amount offered in settlement, (5) the extent of discovery completed and the stage of the proceedings, (6) the experience and views of counsel, (7) the presence of a governmental Case  participant, and (8) the reaction of the class members to the proposed settlement.  *Torrisi*, 8 F.3d at 1375; *accord Hanlon*, 150 F.3d at 1026.  "In

addition, the settlement may not be the product of collusion among the negotiating parties." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 458.

"[S]trong judicial policy . . . favors settlements, particularly where complex class action litigation is concerned." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).  When "the parties negotiate a settlement agreement before the class has been certified, settlement approval 'requires a higher standard of fairness' and 'a more probing inquiry than may normally be required under Rule 23(e).'"  *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1048 (9th Cir. 2019) (quoting *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012).  Because a class was not certified prior to the parties' settlement, the Court applies a "higher standard" and conducts a "more probing inquiry" in evaluating the fairness of the Settlement Agreement.  Further, the Court neither presumes the Settlement Agreement is fair nor that it is the product of non-collusive, arms-length negotiations in evaluating the applicable factors.

## III.   DISCUSSION

### A.   Product of Serious, Informed, Non-Collusive Negotiations

As previously found by this Court, the parties engaged in arm's length, serious, informed, and non-collusive negotiations between experienced and knowledgeable counsel.  (Dkt. 212 at 9).  Additionally, the Settlement Agreement was reached after mediation with a neutral mediator, Mark Rudy. (*Id.*).

Because the parties signed the Settlement Agreement prior to class certification, it "must withstand an even higher level of scrutiny for evidence

of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).  The Court must perform an "exacting review" and analyze potential "subtle signs of collusion." *Roes*, 944 F.3d at 1049.

The Court has carefully scrutinized the Settlement Agreement and evidence submitted by the parties and objectors and finds no signs of overt or subtle collusion.  By the time the Settlement Agreement was signed, the parties had tenaciously litigated this case for nearly a decade.  Over one million pages of documents were produced in discovery, and at least 14 depositions were taken in the long course of this litigation.  (Dkt. 197-1 at p. 19); *see In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 320 (N.D. Cal. 2018) ("Extensive discovery is … indicative of a lack of collusion, as the parties have litigated the case in an adversarial manner"); *see also Hanlon*, 150 F.3d at 1026 ("the extent of discovery completed and the stage of the proceedings" is relevant to fairness of settlement).  Plaintiff Gilbert Saucillo and his counsel also prepared a lengthy motion for class certification supported by significant evidence and, when the motion was denied, petitioned the Ninth Circuit for permission to appeal under Rule 23(f).  (Dkt. 134, Ninth Cir. Case No. 16-80070.)  The significant adversarial litigation in this case is indicative of a non-collusive settlement.

In addition, the parties attended a full day mediation with experienced mediator Mark Rudy on April 23, 2018, and continued negotiating the terms of the settlement (with Mr. Rudy's continued assistance) until it was finally

executed more than a year later in May 2019.  (Dkt. 197-1 ¶ 7.)  The length of the negotiations is further evidence of a non-collusive arms-length settlement.

The Court further finds that none of the potential "subtle signs of collusion" identified by the Ninth Circuit are present in the Settlement Agreement.  *Roes*, 944 F.3d at 1049.  These potential signs include "(1) when counsel receive a disproportionate distribution of the settlement; (2) when the parties negotiate a 'clear sailing' arrangement (i.e., an arrangement where defendant will not object to a certain fee request by class counsel); and (3) when the parties create a reverter that returns unclaimed [funds] to the defendant."  *Id.* (quotations omitted).  As set forth below, the Court is approving plaintiffs' attorneys' fees equal to 25% of the Gross Settlement Amount, which is consistent with the Ninth Circuit "benchmark" and not disproportionate to the class recovery.  *See Hanlon*, 150 F.3d at 1029.  Additionally, the Settlement Agreement does not contain the type of "clear sailing arrangement" that is cause for concern.  Only "a clear sailing arrangement providing for the payment of attorneys' fees separate and apart from class funds" is potentially indicative of collusion.  *In re Bluetooth*, 654 F.3d at 947; *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 961 n. 5 (9th Cir. 2009) (defendant's agreement to not contest requested attorneys' fees from a capped settlement fund "does not signal the possibility of collusion").  Under the Settlement Agreement, approved attorneys' fees are paid from a fixed Gross Settlement Amount, and Defendants' obligations are not affected by the amount of fees awarded.  (Dkt. 197-1 at pp. 13, 16-

1   17.)  Finally, no portion of the settlement fund can revert to Defendants.  (*Id.*
2   at p. 13.)

3        The Court therefore finds that parties engaged in arm's length, serious,
4   informed, and non-collusive negotiations.  The Court reaches this conclusion
5   based on the evidence submitted by the Parties and an exacting review of
6   the settlement terms, not through application of any presumptions.  This
7   factor weighs in favor of approval.

8        **B.     The Strength of the Plaintiff's Case and Future Risks[3]**

9        In assessing the strength of the case, the Court need not "reach any
10  ultimate conclusions on the contested issues of fact and law which underlie
11  the merits of the dispute, for it is the very uncertainty of [the] outcome in
12  litigation and avoidance of wasteful and expensive litigation that induce
13  consensual settlements."  *Officers for Justice v. Civil Serv. Comm'n of San*
14  *Francisco*, 688 F.2d 615, 625 (9th Cir.1982).  As to risk, the Court may
15  "consider the vagaries of litigation and compare the significance of
16  immediate recovery by way of the compromise to the mere possibility of
17  relief in the future, after protracted and expensive litigation."  *Vasquez v.*
18  *Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 489 (E.D. Cal. 2010) (citation
19  omitted).  "In most situations, unless the settlement is clearly inadequate, its
20  acceptance and approval are preferable to lengthy and expensive litigation
21
22  _____
23  [3] As the first three *Hanlon* factors—strength of the plaintiffs' case; the risk,
    expense, complexity, and likely duration of future litigation; and the risk of
24  maintaining class action status throughout the trial—are interrelated, the
    Court discusses them together here.  *Hanlon*, 150 F.3d at 1026.
25

with uncertain results." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 525, 526 (C.D. Cal. 2004) (internal quotation marks omitted).

Plaintiffs describe at length the risks they would face in continuing to litigate their claims.  (Dkt. 227-1 at 16–19).  Several of those are shared by all class actions at this stage in their lifecycle: "(i) a denial of certification . . .; (iii) the possibility of an unfavorable, or less favorable, result at trial on the class or PAGA claims; (iv) the possibility post-trial motions may result in an unfavorable, or less favorable, result at trial; and, (v) the possibility of an unfavorable, or less favorable result on appeal, and the certainty that process would be lengthy."  (*Id.* at 16–17).

Plaintiffs also stress the particular challenges of this case, including complex and disputed facts and strong defenses raised by Defendants.  As the parties note, this Court has denied class certification in several similar trucking cases, indicating that success on the merits was by no means certain.  (*Id.* at 17).  This lawsuit has lasted nearly a decade, and it continues to have "the potential to impose enormous litigation costs on all of the parties" going forward.  (*Id.* at 18).  Moreover, a 2018 regulatory determination by the Federal Motor Carrier Safety Administration—which determination was upheld on appeal—held that federal law preempts the California law claims alleged by Plaintiffs, which could make the class' claims worth very little.  (*Id.*).  In sum, Plaintiffs face a "substantial risk of incurring the expense of a trial without any recovery."  *In re Toys R Us-Del., Inc.-Fair & Accurate Cred. Trans. Act (FACTA) Litig.*, 295 F.R.D. 438, 451 (C.D. Cal. 2014).  This factor weighs in favor of approval.

1

## C.   The Amount Offered in Settlement

2   "To determine whether [a] settlement amount is reasonable, the Court

3   must consider the amount obtained in recovery against the estimated value

4   of the class claims if successfully litigated."  *Millan v. Cascade Water Servs.*

5   *Inc.*, 310 F.R.D. 593, 611 (E.D. Cal. 2015) (citing *Litty v. Merrill Lynch & Co.,*

6   *Inc.*, No. CV-14-0425-PA, 2015 WL 4698475, at *9 (C.D. Cal. April 27, 2015)

7   (quoting I*n re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir.2000)).

8   A proposed settlement may be fair, adequate, and reasonable even though

9   greater recovery might be available to the class members at trial.  *See*

10  *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998).  "It is

11  well-settled law that a cash settlement amounting to only a fraction of the

12  potential recovery does not per se render the settlement inadequate or

13  unfair."  *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 628 (9th

14  Cir.1982).  Further, the Ninth Circuit has long deferred to the parties' private,

15  consensual decisions.  *See Hanlon*, 150 F.3d at 1027.

16  In its preliminary order approving the Settlement Agreement, the Court

17  noted the overall settlement amount of $7,250,000 is within the range of

18  reasonableness, albeit on the low end of what Plaintiffs estimate their claims

19  could be worth ($211,000,000).  (Dkt. 212-1 at 15.)  This factor weighs in

20  favor of approval.

21  ## D.   The Extent of Discovery Completed and the Stage of the

22  Proceedings

23  This inquiry requires the Court to evaluate whether "the parties have

24  sufficient information to make an informed decision about settlement."

25

*Linney*, 151 F.3d at 1239.  Where the parties have conducted extensive discovery, this factor favors final approval "because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case."  *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 527 (internal quotation marks omitted).

Here, the parties possessed a very significant amount of information to make an informed decision about the Settlement Agreement.  Plaintiffs state the case has been "heavily litigated, including extensive pre-certification discovery covering both liability and damages."  (Dkt. 197 at 14).  Prior to mediation, the parties exchanged discovery on payroll, Department of Transportation and other driver logs, and corporate policy documents relating to compensation.  (*Id.* at 14–15).  Both sides also took depositions.  (*Id.* at 15).  Accordingly, this factor weighs in favor of approval.

### E.    The Experience and Views of Counsel

Since "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation," courts tend to give considerable weight to counsel's opinion.  *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir. 2009) (quoting *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995)).  Additionally, counsel are typically better positioned than the Court to produce a fair settlement, given the amount of investigation and research they have conducted.  *See id.*

Here, counsel for both sides represent they have ample experience litigating wage and hour law and class actions.  (Dkt. 227-1 at 20).  They

state the Settlement Agreement "is fair, adequate, and reasonable and in the bests interests of the Class" based on "the complexities of this case, the ever changing state of the law, . . . the uncertainties of the outcome of class certification and further litigation, . . . a realistic assessment of the strengths and weaknesses of their respective cases, extensive legal and factual research, and substantial discovery." (*Id.* at 20–21). The Court finds this factor weighs in favor of approval.

## F.    The Presence of a Governmental Participant

There is no government participant in this action, but Plaintiffs brought claims under California's Private Attorneys General Act ("PAGA") on behalf of the state and affected employees. Under PAGA, the Labor and Workforce Development Agency (the "LWDA") is entitled to 75 percent of any settlement of civil penalties awardable under the Labor Code. *See* Cal. Labor Code § 2699(i).

The Settlement Agreement provides for a $500,000 PAGA payment, or roughly 6.9% of the Net Settlement Amount, $375,000 of which will go to the LWDA. (Dkt. 227-1 at 12). Although this is a significant penalty, it is consistent with the PAGA's purpose of "augmenting the state's enforcement capabilities, encouraging compliance with Labor Code provisions, and deterring noncompliance." *O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1135 (N.D. Cal. 2016) (citation omitted). Additionally, the parties state they notified the LWDA of the terms of the Settlement, and the LWDA has not objected. (Dkt. 225 at 14; *see Echavez v. Abercrombie & Fitch Co.*, No. 11-cv-09754-GAF, 2017 WL 3669607, at *3 (C.D. Cal. Mar. 23, 2017) ("The

Court infers LWDA's non-response is tantamount to its consent to the proposed settlement terms, namely the proposed PAGA penalty amount. The primary purpose of PAGA, i.e., the empowerment of aggrieved employees to act as private attorneys general to collect civil penalties from their employers for Labor Code violations, is served by the proposed PAGA penalty in the parties' settlement agreement."); *Jordan v. NCI Grp., Inc.*, No. 16-cv-1701-JVS-SPx, 2018 WL 1409590, at *3 (C.D. Cal. Jan. 5, 2018) ("[T]he Court finds it persuasive that the LWDA was permitted to file a response to the proposed settlement and no comment or objection has been received.")).  This factor weighs in favor of approval.

### G. The Reaction of The Class Members to the Proposed Settlement

Following preliminary approval of the settlement by the Court, the settlement administrator mailed a notice of pending settlement (the "Notice") to each of the 19,544 identified class members.  (Dkt. 219 ¶¶ 3–7).  The Notice explains in plain language what the case is about, what the recipient is entitled to, and the options available to the recipient in connection with this case, as well as the consequences of each option.  (*Id.*, Ex. A). During the allotted response period, the settlement administrator received eleven requests for exclusion from the settlement and four objections.  (*Id.* at ¶ 11; Dkt. 227-1 at 21).  The administrator deemed 339 Notices undeliverable. (Dkt. 219 ¶¶ 8–10).  As a result, a total of 19,194 class members (98.2% of the class) will participate in the Settlement Agreement.

"[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms . . . are favorable to the class members."  *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 529.  "The purpose of Rule 23(e) is to protect the unnamed members of the class from unjust or unfair settlements affecting their rights."  *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008) (citation omitted).

Although "[n]o particular standard governs judicial review of objections," courts evaluate objections in the course of "determining whether the settlement meets Rule 23's fairness standard." 4 W. Rubenstein, Newberg on Class Actions § 13:35 (5th ed. 2012). "[T]he trial court has some obligation to consider objections but is given significant leeway in resolving them."  *Id.*

Here, only eleven class members—a fraction of one percent of the class—opted out of the Settlement Agreement.[4]  (*See* Dkt. 219 ¶ 11).  Such a low number favors approval.  Four class members have lodged objections,

_____

[4] Two other class members, James Arias and Antonio Williams, filed late requests for exclusion from the Settlement Agreement. (Dkts. 233, 233-1, 233-2). They contend they did not receive the Notice and, if they had, would have opted out.  (*Id.*).  Federal Rule of Civil Procedure 5(b)(2)(C) states service may be effected by "mailing [a notice] to the person's last known address—in which event, service is complete upon mailing."  According to documents provided by the attorney for Mrs. Arias and Williams, the settlement administrator mailed copies of the Notice to the correct and current addresses for both of his clients (*see* Dkt. 233 at 3, 15, 40). Mrs. Arias and Williams have offered no evidence "to overcome Rule 5(b)'s presumption of service," *McElyea v. Attorney Gen. of Arizona*, 457 F. App'x 646, 647 n. 3 (9th Cir. 2011), and, accordingly, the Court denies their request for exclusion.

which the Court has read and considered.  (See Dkts. 213, 216, 217, 218).
The parties have also filed responses to each objection.  (Dkts. 221, 222,
225).  The Court finds the objections unpersuasive and discusses each in
turn.

Sadashiv Mares argues the Gross Settlement is inadequate for several
reasons, the common theme of which is that he believes the parties'
estimate of Defendants' maximum possible exposure is too low.  (Dkt. 218,
274).  The Court addressed Mares's concerns before granting preliminary
approval of the Settlement Agreement and, as discussed above as well as in
its prior order, finds the Gross Settlement Amount fair and reasonable.  (*See*
Dkt. 212 at 13).  Mares asserts that the parties' exposure estimates are
"unsupported" (Dkt. 218 at 2; *see also* Dkt. 274), but the parties proffer
evidence that directly contradicts his position (Dkt. 221).  For instance,
Defendants' director of payroll Robin Rohwer states her review of corporate
records showed "that there were 847,503 weeks worked by Swift California
employee drivers earning mileage-based trip pay from March 22, 2006
through January 31, 2019."  (Dkt 221 ¶ 4).  Thus, Mares' argument that
estimating wage claim exposure based on a total of 850,000 workweeks is
"whimsical" is plainly wrong.

Anthony Blakely and James Herron make a limited objection,
requesting "that the Court carve out from the Burnell settlement unpaid,
meal and rest breaks, unreimbursed business expenses, and derivative
claims of hostlers, for the time during the Burnell settlement class period
these employees were hostlers."  (Dkt. 216 at 4; *see* Dkt. 217).  Blakely and

Herron are settlement class members who worked for Defendants as both drivers and hostlers.  (Dkt. 216-1 at 2; Dkt. 217-1 at 2).  They contend the Settlement Agreement would improperly extinguish claims of similarly situated class members for periods when such class members were employed as hostlers rather than as drivers.  (Dkt. 216 at 5, 7–8).  There are presently two class actions solely on behalf of hostlers under submission in California district courts, and Blakely and Herron have both received notices that they are part of those classes.  (Dkt. 216-1 at 2; Dkt. 217-1 at 2).  The parties themselves disagree as to whether the Settlement Agreement releases the claims of hostlers.  (Dkt. 227-2 at 25–26).  Defendants point out, however, that the Settlement Agreement explicitly deals with mileage based compensation, and because hostlers can earn the same mileage based pay as fulltime over-the-road drivers while driving long-haul routes, "hostler claims may be properly released to the extent the hostlers earned mileage-based pay in any workweek."  (Dkt. 222 at 2–3).  The Court agrees.

"A settlement agreement may preclude a party from bringing a related claim in the future even though the claim was not presented and might not have been presentable in the class action, but only where the released claim is based on the identical factual predicate as that underlying the claims in the settled class action."  *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) (internal quotation marks and citations omitted).  With regard to the remaining claims of hostlers, Defendants contend that the same facts give rise to the claims of hostlers and other drivers (Dkt. 222 at 2–3), whereas Blakely and Herron argue "the underlying claims [in *Burnell*] are based on

-16-

1   the facts applying to drivers only" (Dkt. 216 at 8).  The "'identical factual

2   predicate' argument is a mixed question of law and fact," Hesse, 598 F.3d at

3   590, and the record here is inadequate to determine whether hostlers'

4   claims are properly included in the Settlement Agreement.

5       Moreover, courts are unwise to attempt to guess how their decisions

6   will affect future litigation.  *See Phillips Petroleum Co. v. Shutts*, 472 U.S.

7   797, 805 (1985) ("[A] court adjudicating a dispute may not be able to

8   predetermine the res judicata effect of its own judgment . . .."); *Matsushita*

9   *Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 396 (1996) (Ginsburg, J.,

10  concurring in part and dissenting in part) ("A court conducting an action

11  cannot predetermine the res judicata effect of the judgment; that effect can

12  be tested only in a subsequent action.").  The parties in the two hostler-only

13  cases have conducted significantly more discovery and motion practice and

14  are better positioned to test the preclusive effect of the Settlement

15  Agreement.  (*See* Dkt. 216 at 4–5).

16      Finally, Lawrence Peck contends the class representatives lack

17  standing to settle the PAGA claim, as they allegedly failed to exhaust certain

18  administrative procedures before bringing the present lawsuit. (Dkt. 213 at

19  11, 275-276).  Peck's standing argument is not well-taken, as "[f]ailure to

20  exhaust administrative remedies under the PAGA is an affirmative defense

21  subject to waiver" rather than a prerequisite to standing.  *See Batson v.*

22  *United Parcel Serv., Inc.*, No. 12-CV-0839 BTM-JMA, 2012 WL 4482782, at

23  *2 (S.D. Cal. Sept. 27, 2012); *Alcantar v. Hobart Serv.*, No. 11-CV-1600

24  PSG, 2013 WL 228501, at *4 (C.D. Cal. Jan. 22, 2013).  Peck also argues

25

the PAGA penalty provided by the Settlement Agreement is "unfair and inadequate."  (Dkt. 213 at 11, 275-276).  The Court addresses the sufficiency of the PAGA award above.

Accordingly, the Court finds this factor weighs in favor of approval.

### H.    Balancing the Factors

As all the relevant factors favor approval, the Court finds that the proposed Settlement Agreement is fair, reasonable, and adequate and GRANTS final approval of the Settlement Agreement.[5]

### I.    Plaintiffs' Motion for Attorneys' Fees

Notwithstanding an explicit agreement to shift attorneys' fees in a certified class action, "courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have

---

[5] Fed. R. Civ. P. 23 was amended in 2018 to list four factors a district court should consider when evaluating a class action settlement.  Fed. R. Civ. P. 23(e)(2).  The Ninth Circuit in this case declined to decide "how district courts should incorporate the [new] Rule 23(e)(2) factors into their analyses."  (Dkt 270 at p. 10 n. 3).  However, the Rule 23(e)(2) factors are similar to and substantially overlap with the *Hanlon* factors identified above. The Court therefore reaches the same conclusions regarding the fairness of the settlement under the Rule 23(e)(2) factors as it does under *Hanlon*.  *See Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1121 n. 10 (9th Cir. 2020) (declining to decide whether the 2018 amendment listing factors applied retroactively "because applying the amended version of the rule would not change our conclusions"); *see also Ciuffitelli v. Deloitte & Touche* LLP, 2019 WL 6893018 (D. Or. 2019), report and recommendation adopted, 2019 WL 6840844 (D. Or. 2019) ("Because the two sets of factors are consistent with one another, the court analyzes the proposed settlement using both the Rule 23(e) requirements and the *Hanlon* factors."); *see also* Fed. R. Civ. P. 23 advisory committee's note ("The goal of this [2018] amendment is not to displace any factor" historically used by the courts).

-18-

already agreed to an amount." *Jones v. GN Netcom, Inc. (In re Bluetooth Headset Prods. Liab. Litig.)*, 654 F.3d 935, 941 (9th Cir. 2011).

Reasonable attorneys' fees are generally calculated by application of the lodestar method, which requires multiplying a reasonable hourly rate by the hours reasonably expended. *See City of Riverside v. Rivera*, 477 U.S. 561, 568 (1986) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).

The Ninth Circuit has held that "the district court has discretion in common fund cases to choose either the percentage-of-the-fund or the lodestar method." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (citing *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1295–96 (9th Cir.1994)). Here, Plaintiffs seeks to employ the percentage-of-the fund method and request $2,416,666.67, i.e., one-third of the Gross Settlement Amount, on behalf of Class Counsel. (Dkt. 227-1 at 23).

When using the percentage-of-the-fund method, "courts typically set a benchmark of 25% of the fund as a reasonable fee award and justify any increase or decrease from this amount based on circumstances in the record." *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 455 (E.D. Cal. 2013); *see Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989). A court may adjust the percentage upward or downward based on (1) the results achieved; (2) the risks of litigation; (3) the skill required and the quality of work; (4) the contingent nature of the fee; and (5) the awards made in similar cases. *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008) (citing *Vizcaino*, 290 F.3d at 1048–50). The Court addresses these factors below.

### 1.   <u>Results Achieved</u>

"The overall result and benefit to the class from the litigation is the most critical factor in granting a fee award."  *In re Omnivision Techs.*, 559 F. Supp. 2d at 1046.  After proposed attorneys' fees and other deductions, the Net Settlement Amount would be $4,273,333.33, which translates to an estimated average award of $217.50 per class member.  (Dkt. 227-1 at 12).

Class counsel argue that this is an excellent result given "the uncertainties associated with continued litigation on Plaintiffs' claims, and Defendants' vigorous denials and affirmative defenses."  (*Id.* at 27).  As discussed above, Plaintiffs faced an uphill battle in prosecuting their case and the possibility of no recovery at all.  The Court has also repeatedly noted, however, that the Gross Settlement Amount is at the low end of reasonable and a small fraction (3.4%) of the claims' potential value.

Upward departures from the benchmark typically require an "exceptional" result, *see Monterrubio*, 291 F.R.D. at 456, and the Court finds the result here does not justify such a departure.  In explaining why the settlement justifies above-benchmark attorneys' fees, Plaintiffs merely note the risks of further litigation.  (Dkt. 227-1 at 27–28).  Without more—and Plaintiffs do not describe anything out of the ordinary—a recovery in that range "simply do[es] not lead the Court to conclude that the result is 'exceptional,'" *see Monterrubio*, 291 F.R.D. at 456 (rejecting an application for attorneys' fees equal to 33.33% where recovery equaled 30% of the defendants' maximum liability exposure).

### 2.   <u>Risks of Litigation</u>

Class Counsel assumed a measure of risk by representing Plaintiffs, given that class certification was previously denied in this case and similar lawsuits have failed to achieve certification or have lost on summary judgment.  (Dkt. 227-1 at 17, 26; *see also Vizcaino*, 290 F.3d at 1048 (finding case "risky" when, among other factors, plaintiffs lost twice in district court and there was absence of supporting precedent)).  In addition, the first cases in this consolidated action are nine years old, meaning class counsel bore a financial burden for longer than usual.  The risk, however, is not clearly the type of extreme risk that would merit a departure from the 25% benchmark.  *See Monterrubio*, 291 F.R.D. at 456–57 (finding case was not "extremely risky" although it was questionable whether the class could be certified, whether the plaintiff could prove an employer's policies violated labor code sections on a "knew or should have known" standard, and whether plaintiff could overcome an "exhaustion defense"); *Hawthorne v. Umpqua Bank*, No. CV 11-06700-JST, 2015 WL 1927342, at *5 (N.D. Cal. Apr. 28, 2015) (holding the risk in a case did not merit an attorneys' fees award of 33% even though the class counsel "expended a significant amount of time and effort litigating this case over the past three years and undertook a major risk by taking it on a contingency basis.").  Accordingly, this factor weighs only slightly in favor of an upward departure from the benchmark.

### 3.  <u>Contingent Nature of the Fees</u>

Class Counsel took this case on a contingent fee basis.  The Ninth Circuit "has suggested the distinction between a contingency arrangement and a fixed fee arrangement alone does not merit an enhancement from the benchmark."  *Richardson v. THD At-Home Servs., Inc.*, No. CV 14-0273-BAM, 2016 WL 1366952, at *9 (E.D. Cal. Apr. 6, 2016) (citing *In re Bluetooth*, 654 F.3d at 942 n.7); *see also Torrisi,* 8 F.3d at 1376 (noting that there were "no special circumstances . . . which indicate the 25% benchmark award is either too small or too large" even though class counsel took the case on "double contingency").  Accordingly, the Court will treat this factor as neutral.

### 4.  <u>Skill and Quality of the Work</u>

Class Counsel contend that their "experience in class actions weighed heavily in obtaining a benefit to each member of the Class." (Dkt. 227-1 at 26).  While the Court does not doubt Class Counsel are experienced and skilled litigators, "this case is, quite simply, a garden variety wage and hour class action," *see Monterrubio*, 291 F.R.D. at 457.  The legal issues presented were neither complex nor novel; motion practice prior to settlement was substantial but within the ordinary course; and Counsel have litigated class actions with similar claims and issues, *see, e.g., Cole v. CRST, Inc.*, 150 F. Supp. 3d 1163, 1165 (C.D. Cal. 2015).  The Court will treat this factor as neutral.

1

### 5.   Awards Made in Similar Cases

2 As noted above, the Ninth Circuit has established a 25% benchmark

3 award for attorneys' fees.  *Hanlon*, 150 F.3d at 1029. Class Counsel cite

4 several cases in which courts have awarded attorneys' fees at or above 33%

5 of the total settlement fund. (Dkt. 227-1 at 30).  While some of these may be

6 analogous to the present case, others are distinguishable.  *See, e.g., Taylor*

7 *v. Shippers Transp. Express, Inc.*, No. 13-CV-02092-BRO-PLAx, 2015 WL

8 12658458, at *10 (C.D. Cal. May 14, 2015) (awarding 33.33% of the

9 settlement as attorneys' fees where plaintiffs recovered between 42% and

10 65% of the estimated maximum sum that could be awarded at trial" and

11 approximately $13,140.66 per class member).

12 Moreover, for every case involving an upward departure, there are

13 several to show that courts generally adhere to the Ninth Circuit's

14 benchmark when awarding fees in wage and hour class actions.  *See*

15 *Brooks v. Life Care Centers of Am., Inc.*, No. SACV-12-00659-CJC (RNBx),

16 2015 WL 13298569, at *4 (C.D. Cal. 2015) ("Awarding the benchmark in

17 mine run of wage and hour cases appears to be standard in this District.");

18 *Bravo v. Gale Triangle, Inc.*, No. CV-16-03347-BRO (GJSx), 2017 WL

19 708766, at *16 (C.D. Cal. Feb. 16, 2017) (rejecting an upward departure

20 from the benchmark and noting that, "while some courts have found that an

21 upward adjustment is supported in wage and hour class action cases, other

22 courts have not, or have found that such adjustments are supported only

23 when the results are exceptional"); *Monterrubio*, 291 F.R.D. at 457–58

24 (rejecting the class counsel's request for a departure from the 25%

25

benchmark in what the court deemed "a garden-variety wage and hour class action").  Class Counsel have not established that a departure is warranted here.  Accordingly, this factor weighs against departing from the 25% benchmark.

### 6. <u>Lodestar Cross-Check</u>

"Courts may apply the lodestar method as a 'cross-check'" on the reasonableness of a percentage-based fee award."  *Bravo*, 2017 WL 708766 at *17 (citing *Vizcaino*, 290 F.3d at 1050). "[W]hile the primary basis of the fee award remains the percentage method, the lodestar may provide a useful perspective on the reasonableness of a given percentage award." Vizcaino, 290 F.3d at 1050.

The lodestar is "calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." *Morales v. City of San Rafael*, 96 F.3d, 359, 363 (9th Cir. 1996). "To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."  *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008) (quoting *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984)); *Roberts v. City and County of Honolulu*, 2019 DJDAR 8807–08 (9th Cir. 2019). The "relevant community" for purposes of the "prevailing market rate" is the "forum in which the district court rests." Id. at 979.

The Court has performed a limited review of Class Counsel's billing reports. *See Schiller v. David's Bridal, Inc.*, No. CV-10-00616-AWI, 2012 WL 2117001, at \*20 (E.D. Cal. June 11, 2012) ("Where the use of the lodestar method is used as a cross-check to the percentage method, it can be performed with a less exhaustive cataloguing and review of counsel's hours."). Class Counsel have state they spent a total of 2,763.12 attorney hours on this case, at hourly rates between $800 and $925, yielding a lodestar total of $2,164,347.83 in fees. (See Dkt. 227-2 ¶ 19; Dkt. 227-5 ¶ 15; Dkt. 227-6 ¶ 9).

The hourly logs submitted in support of these fees contain multiple instances of excessive billing, particularly in time billed for correspondence and communication. For instance, logs submitted by Marlin & Saltzman, LLP, contain vague, one-word entries such as "Communications," for which Class Counsel billed thousands of dollars. (See, e.g., Dkt. 227-6 at 25). In another instance, Mr. Hawkins billed 0.7 hours, or $647.50 (more than three times the average class member's recovery), on March 1, 2012 for receiving a voicemail from his client and returning the call. (Dkt. 227-2 at 57). He billed another 0.6 hours ($555) on April 15, 2012 and 0.5 hours ($462.50) on August 10 for receiving and making status calls. (*Id.* at 58–59). The logs also show billing for clerical tasks for which no attorney should charge his client $925 per hour. (*See*, *e.g.*, *id.* at 74 (billing 1.3 hours, or $1,202.50, for "calendar," "scan docs and calendar, and "set up and confirm court call; calendar"; Dkt. 227-6 at 21 (billing 0.75 hours, or $562.50, for "pulling docket items").

Even if Class Counsel were to update their lodestar figures to remove improper charges, "[t]he fact that the lodestar significantly outpaces an award based on the 25% benchmark" without more "is not a compelling reason to depart from the Ninth Circuit's benchmark, particularly absent evidence of exceptional risk or difficulty." *Brooks*, 2015 WL 13298569, at *5; *see also Ridge v. Infinity Sales Grp., LLC*, No. CV 12-6985-GW (SHx), 2014 WL 12589629, at *8 (C.D. Cal. July 24, 2014) (noting that, "[g]enerally speaking, this Court does not exceed the ... 25% benchmark" in "relatively simple and straightforward" cases unless "there is some indication that counsel performed exceptionally or in another unusual manner" and that "[t]his remains true even though Plaintiff's counsel indicates that the figure he seeks is itself already a negative multiplier when a lodestar cross-check is applied"); *Sandoval v. Tharaldson Employee Management, Inc.*, No. EDCV 08-482-VAP (OPx), 2010 WL 2486346, at *9 (C.D. Cal. June 15, 2010) (rejecting a request to exceed the 25% benchmark because the plaintiff did not "present[ ] evidence of unusual circumstances that justify a departure from the Ninth Circuit's benchmark" aside from arguing that the lodestar exceeded the benchmark).

## 7.   <u>Conclusion</u>

The totality of the benchmark departure factors does not weigh in favor of an award above the 25% benchmark.  In addition, the Court declines to rely on Class Counsel's lodestar calculation figures for the reasons stated above.

1    The Court, therefore, finds that the facts of this case do not present the

2    type of "unusual circumstances" required to justify a departure from the

3    benchmark.  *Graulty*, 866 F.2d at 272.  The Court DENIES Class Counsel's

4    application for attorneys' fees equal to 33.33% of the settlement fund

5    ($2,416,666.67) and APPROVES an attorneys' fees award of 25% of the

6    settlement fund ($1,812,500.00).

7         **J.    Class Counsel Expenses**

8         Class Counsel seeks $67,551.61 in reimbursement for costs.  (Dkt.

9    227-1 at 12).  They have submitted a detailed accounting as to those

10   expenses (Dkt. 227-2 at 78–79; 227-5 at 13–14; 227-6 at 39–56), which the

11   Court has reviewed line-by-line.  Many of the requests are for excessive or

12   inappropriate expenses, or are insufficiently explained.  The law firm of

13   Marlin and Saltzman, LLP, for example, requests $500 for a "Facebook

14   Campaign," and $748.90 for investigative services to locate the named

15   plaintiff (their own client).  (Dkt. 227-6).  Counsel request $740 for "witness

16   fees and mileage" for class representative Saucillo, with no explanation why

17   the class representatives should receive witness fees.  (*Id.*).  Counsel

18   submitted costs for filing fees as late as May 15, 2019, although no fees are

19   imposed in the District Court other than for filing an initial complaint.  (*Id.*).

20        Class counsel also consistently opted for costlier services, including

21   spending thousands of dollars on couriers to deliver mandatory chambers

22   copies (the Court's Standing Order specifies that courtesy copies may be

23   delivered the day after electronic filing, allowing for overnight rather than

24   same day delivery (*see* Dkt. 6 at 4)) and car services when traveling.  There

25

is no explanation for Class Counsel's hotel expenses in Agoura Hills and Los Angeles, where the firm has its offices.  (Dkt. 227-6).  Finally, although the Court does not reduce reimbursement for these costs, it notes Counsel spent hundreds on FedEx service—rather than USPS, for instance—when sending documents to and from the class representatives.  (Dkt. 227-6).

The Court does not approve reimbursement for the items described above.  After subtracting inappropriate charges, the Courts awards Class Counsel $61,630.48 for expenses.

### K.    Incentive Award

Named plaintiffs "are eligible for reasonable incentive payments." *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003).  Such awards "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958–59.  "The district court must evaluate [incentive] awards individually, using 'relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonabl[e] fear[s of] workplace retaliation.'" *Staton*, 327 F.3d at 977.

Courts may also consider: "1) the risk to the class representative in commencing suit, both financial and otherwise; 2) the notoriety and personal difficulties encountered by the class representative; 3) the amount of time and effort spent by the class representative; 4) the duration of the litigation;

-28-

and 5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation." *Van Vranken v. Atl. Richfield Co.,* 901 F. Supp. 294, 299 (N.D. Cal. 1995).

Here, Plaintiffs request that class representatives James Rudsell and Gilbert Saucillo each receive an incentive payment of $5,000.00. (Dkt. 227-1 at 34).  Rudsell and Saucillo submitted declarations describing their involvement in the lawsuit and the risks of being the face of an employment class action. (Dkts. 227-3, 227-4).  The Court finds the proposed incentive payment consistent with awards made in similar cases. *See Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008) ("Courts have generally found that $5,000 incentive payments are reasonable."); *Hillman v. Lexicon Consulting, Inc.*, No. 16-cv-01186-VAP-SPx, 2017 WL 10434013, at *9 (C.D. Cal. Oct. 12, 2017).  Accordingly, the Court APPROVES incentive award payments of $5,000.00 for each named plaintiff.

## L.    Settlement Administrator Costs

Plaintiff requests the Court approve the reasonable costs of administering the settlement, in an amount equal to $100,000. (Dkt. 227-1 at 34).  The settlement administrator was charged with administering the settlement fund by, among other things, mailing the Notice to settlement class members; receiving and tracking claim forms; receiving and tracking opt outs and objections from nonparticipating class members; and distributing payments to all participating class members. (Dkt. 219 at 2–4)

The Court finds the settlement administrator expenses reasonable and APPROVES the reimbursement.

## IV.   CONCLUSION

For the reasons stated above, the Court GRANTS the parties' stipulation to re-approve the Motion for Final Approval of Class Settlement following the Ninth Circuit's remand and GRANTS IN PART the Motion for Final Approval of Class Action Settlement.

The Court GRANTS IN PART and DENIES IN PART the request for approval of attorneys' fees, costs, and class representative enhancement, as follows: Class Counsel's request for attorneys' fees in the amount of $2,416,666.67 is DENIED; instead, the Court APPROVES attorneys' fees for Class Counsel of no more than $1,812,500.00; and the parties' request for a $5,000.00 incentive payment to the named plaintiffs is GRANTED.

All other cost reimbursements are APPROVED as set forth above.

**IT IS SO ORDERED.**

Dated:____4/28/22____                                             
Virginia A. Phillips
United States District Judge